### HAWES v. CORPORATION LIQUIDATION CO.

(Supreme Court, Appellate Division, First Department. April 14, 1905.)

1. BROKERS—COMMISSION—EVIDENCE—SUFFICIENCY.

    In an action by a broker on a contract whereby he was to induce the owner of real estate to sell it to defendant, evidence considered, and *held* insufficient to show that he was instrumental in effecting the sale.

      O'Brien, J., dissenting.

Appeal from Trial Term.

Action by Gilbert R. Hawes against the Corporation Liquidation Company. From a judgment for plaintiff and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

Louis Frankel, for appellant.
John E. Judge, for respondent.

INGRAHAM, J.  The plaintiff, who was an attorney at law, practicing in the city of New York, received from the defendant, a foreign corporation organized under the laws of the state of New Jersey, a communication addressed to him in relation to two apartment houses in Buffalo, N. Y., which stated that the defendant would pay for these apartment houses $70,000 in cash, or $21,000 cash, subject to the present incumbrances, and stated:

"If you succeed in inducing the Stockholders' Real Estate Co. to sell this property to us for any figures less than $69,000, we agree that you shall be entitled to retain and keep the difference.  If, on the other hand, we are obliged to pay $69,000 for the property, we will pay over to you the sum of $1,000 as your fee and commissions in the matter."

This letter was signed by the defendant, per Andrew Cobe, president.  The complaint alleges that the plaintiff "did succeed in inducing the owners of said real estate to sell the same to the defendant for the sum of $61,000, or $8,000 less than the $69,000, which the defendant was ready and willing to pay for said property."  In this letter the corporation, the owner of the property, is designated the "Stockholders' Real Estate Company."  The real name of the company appears, however, to be the Shareholders' Company.  To entitle the plaintiff to recover under this contract, he was required to prove that he succeeded in inducing the Shareholders' Real Estate Company to sell the property for less than $69,000.  The plaintiff was called as a witness, and examined in his own behalf.  He produced a letter signed "Thos. Barker, Chairman of Committee," which stated that the plaintiff's letter of the 17th inst., containing an offer for these apartment houses, had been received, but that it was impossible at that time to accept his bid.  Just what offer the plaintiff made does not appear.  This was, so far as appears, the only written communication that the plaintiff received from those representing the Shareholders' Real Estate Company.  The plaintiff testified that subsequent to signing this contract with the defendant he had a number of interviews and negotiations with those representing the Shareholders' Real Estate Company, also with a Mr. Sammis, their general counsel, with Mr. Cobe, the president, and with Mr. Butler, the treasurer of the defendant; that on January 26th he had an interview with Sammis, counsel for the Shareholders' Company; but what he said or did at any of these interviews, or whether or not the interviews in any way related to the purchase of the property by the defendant did not appear.  He further testified that on January 27, 1901, he secured what purported to be a copy of the minutes of a special meeting of the Shareholders' Real Estate Company held on February 11, 1901, at which meeting it was resolved that a bid of $52,000, less all mortgages, taxes, or other liens upon the two apartment houses, the property of the company, in the city of Buffalo, made by John B. Kiley, of Rochester, N. Y., should be accepted.  Upon cross-examination of the plaintiff, counsel for the

defendant endeavored to ascertain just what the plaintiff did in relation to the Shareholders' Real Estate Company, but without much success. He was asked whether he ever obtained any contract or memorandum in writing from the Shareholders' Real Estate Company whereby that company agreed to sell the property in question to the defendant for $69,000 or $70,000, or any other sum. In answer the plaintiff testified that he did not have a contract executed under the corporate seal of the real estate company, and he could not recollect whether he had ever had any contract not under seal. Nor was any contract ever produced, either from the Shareholders' Company or from Kiley, its grantee, to convey this property to the defendant. Plaintiff never had any communications or letters from Kiley. There was then introduced in evidence a deed from the Shareholders' Real Estate Company to Kiley, dated February 11, 1901. Subsequent to the conveyance of the property by the Shareholders' Real Estate Company to Kiley the defendant submitted to the plaintiff a contract for the sale of the property from Kiley to the defendant, which was never executed by Kiley. The plaintiff having rested upon this testimony, the defendant moved to dismiss the complaint, which motion was denied. Kiley was then called as a witness, and stated that he did not know the plaintiff, never saw him, never had any conversation with him; that he sold the property to the defendant, and after he sold the property he first received letters from the plaintiff. A deed was then introduced, whereby Kiley conveyed this property to the defendant, dated March 6, 1901. The consideration was $1, and was subject to two mortgages upon the premises. Kiley testified that he saw the president of the defendant two or three days before the date of the deed; that on the date of the deed he received the consideration for the sale in cash, and handed the deed over to the defendant's president; that he never heard the plaintiff's name from Mr. Sweeney, or from anybody else, and that he never had anything to do with the plaintiff; that he purchased the property at the request of Sweeney, who furnished him with the money which he paid to the Shareholders' Real Estate Company for the property; that Sweeney, at the time he gave him the money, said that the money came from Mr. Miller; that he purchased the property with the understanding with Sweeney that he was to acquire title to the property as owner when Sweeney gave him the funds to buy it; that he was to hold the property for a man named Miller; that when Sweeney first approached him about the property he told him that a man named Miller in New York was to buy the property from the Shareholders' Real Estate Company, and that he (Kiley) was to take title for Miller, and it was under that arrangement that he acquired title to the property, Sweeney paying him the amount that he was to pay for it; that after he acquired title to the property he advertised it for sale; that he received many communications in regard to it, which he forwarded to Sweeney.

Upon this evidence the court submitted to the jury the question as to whether the defendant procured the property through the instrumentality and efforts which the plaintiff put forth in that re-

spect, charging the jury that if he (plaintiff) was the procuring cause, or if, in other words, he performed the contract, then there was another question which was submitted to the jury, growing out of the relation of Mr. Kiley to the transaction. Having thus submitted this question to the jury, the jury was further charged that if, from the evidence, "you find in this case that Kiley held that title for anybody except the plaintiff, that would defeat the plaintiff's recovery in this action. But if, although holding the deed, and although he in form gave a deed to this defendant, it was done for the benefit of the Shareholders' Company, and they received the benefit of the transaction, and he merely held the title for their accommodation or for their benefit, then it was in reality the property of the Shareholders' Real Estate Company of Buffalo, and it was their sale to the defendant just as much as if they had all through the transaction held the actual record title. You may take those two questions, and if you find that the plaintiff performed his contract, and that this deed from Kiley to the defendant was in fact given for the benefit of the Shareholders' Real Estate Company, as I have stated to you, if you find both of these propositions in favor of the affirmative, then your verdict should be for the plaintiff in the sum of $9,380."

The plaintiff's right to recover depended, not upon his conducting negotiations for the sale of the property to the defendant, but upon his complying with a contract which provided that if he succeeded in inducing the Shareholders' Real Estate Company to sell the property to the defendant, he was to receive the difference between the price paid and $69,000. It was only in the event of his complying with this condition that he was entitled to recover. But, as I read this testimony, there is no evidence to show that the plaintiff ever did succeed in inducing the Shareholders' Real Estate Company to sell the property to the defendant at any price, or that his efforts had anything to do with the purchase of the property by the defendant. So far as appears, he never made any offer for the property, except one, which was declined, and had nothing to do with the transaction which resulted in the purchase of the property from Kiley. He says that he had a conversation with the counsel for the company and with a Mr. Sweeney, but he failed to testify as to what that conversation was, or that it related in any way to the purchase of this property. Upon the evidence the case stands thus: The plaintiff called the attention of the defendant to this property in Buffalo, and procured a letter from the defendant, which stated that they were willing to purchase it at $69,000 or $70,000, and that, if he induced the owners of the property to sell it for a sum less than $69,000 the plaintiff was to have the difference between what he procured the property for the sum of $69,000; that he had conversations with counsel for the company and one or two others interested in it; that subsequently the company sold and conveyed the property to a third party, who subsequently conveyed it to the defendant. This certainly did not justify a finding that the plaintiff induced the Shareholders' Real Estate Company or Kiley to convey the property to the defendant, or that the plain-

tiff had anything to do with the transactions, except writing letters to the defendant about it. I think, therefore, that the finding that the plaintiff directly or indirectly induced the Shareholders' Real Estate Company to convey the property to the defendant was without evidence to support it, and that therefore there was no proof that the plaintiff ever performed his contract. The verdict, therefore, being against the weight of evidence, a new trial must be ordered.

It follows that the order denying a motion for a new trial and the judgment appealed from should be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur, except O'BRIEN, J., who dissents.

O'BRIEN, J. (dissenting). The action is brought to recover on a contract whereby the defendant agreed to pay the plaintiff for negotiating a sale to it of certain property in Buffalo. The contract is embodied in a letter to the plaintiff from the defendant, dated January 9, 1901, wherein it was said:

"If you succeed in inducing the Stockholders' Real Estate Co. to sell this property to us for any figure less than $69,000, we agree that you shall be entitled to retain and keep the difference. If, on the other hand, we are obliged to pay $69,000 for the property, we will pay over to you the sum of $1,000."

The complaint avers that in pursuance of this agreement the plaintiff succeeded "in inducing the owners of said real estate to sell the same to defendant * * * for * * * $8,000 less than the $69,000 which defendant was ready and willing to pay," and thereafter the defendant purchased the property for such sum, but refuses to pay to plaintiff his $8,000. The plaintiff relied principally upon correspondence introduced in evidence in support of his claim. The first of these letters and papers is the one referred to, dated January 9, 1901, stating the contract. The second is a letter to plaintiff from "Thos. Barker, Chairman of Committee," saying:

"Your letter dated the 17th inst., containing offer for the apartment houses, * * * received, and I have to state that on behalf of the committee it is impossible at the present time to accept your bid."

The plaintiff testified that this letter was received in the course of negotiations had subsequent to the letter of January 9th, which negotiations included interviews with the officers of the Shareholders' Real Estate Company, and also with Mr. Sammis, their general counsel, with Mr. Cobe, the president of the defendant company, and with Mr. Butler, its treasurer; that this letter, which was in response to one he had written upon the subject-matter of the letter of January 9th, he showed to Mr. Cobe. In objecting to the introduction of the letter in evidence on the ground that it did not prove that the Shareholders' Company and the defendant company agreed upon a price, the defendant admitted that plaintiff wrote a number of letters and received a number, and that he had various conversations at various times. The plaintiff further testified that in response to a letter he had written to defendant he received a letter from its treasurer, dated January 26th, which

letter states that no definite reply could then be made in regard to the items in the letter received, but it would be taken up subsequently; and that he received from the treasurer of defendant on February 23, 1901, in connection with this matter, a letter stating:

"Referring to your letter * * * we note what you say, 'If you delay closing this title after the first of March there will be an additional penalty * * * on the taxes which the seller refuses to be responsible for.' Now Mr. Hawes we would advise you in this matter to advise the other people to pay their taxes, * * * for we certainly shall not be responsible in any way * * * until the title passes to us. The delay in passing the title is not our fault and we certainly cannot go ahead * * * until we have the proper papers signed for the sale of the property. Kindly attend to this at once."

The plaintiff also testified that thereafter he received in the regular course of business in connection with this matter a letter dated February 27, 1901, from the defendant, which states:

"We have just heard from Buffalo and we will be unable to give you an answer as to the time for passing title until we receive the opinion of Mr. Norton, the attorney who has the title in charge. * * * I don't see how we can possibly pass title before Monday as we shall probably desire that the papers pass in Buffalo and a great deal will depend on Mr. Norton's report and opinion. * * * It is essential that you obtain and send us at once a certified copy of the vote authorizing the sale of this property to Mr. Kiley as none appears on record."

The plaintiff testified that he obtained, in response to the defendant's request in the latter part of this letter, a "certificate of proceedings of a special meeting of the Shareholders' Real Estate Company held February 11, 1901." This certificate recites that the shareholders were duly called for the purpose of determining whether they should consent to the execution and delivery of a deed of apartment houses owned by the company, and it was resolved "that the bid of $52,000 less all mortgages, taxes, or other liens for the Wayne and Waldorf apartment houses, the property of the company in the city of Buffalo, made by John B. Kiley of Rochester, N. Y., should be accepted and the board of directors * * * transfer the said property to the said John B. Kiley." In the regular course of business the plaintiff received from defendant a letter dated February 28, 1901, as follows:

"Your memorandum giving us the amount of the mortgages, * * * together with a copy of the certificate of the proceedings of the meeting * * * at which a vote was passed to sell the 'Wayne' and 'Waldorf' to one John B. Kiley for $52,000 has been received. We will forward this copy to our attorney in Buffalo for examination and comparison with the deed and upon receipt from him of his opinion that the title is clear we will be ready to pass title and we will now set Thursday March 7th at 12 o'clock noon at this office for passing such title at which time you are to furnish us with a certified copy of the said certificate together with a proper deed from said Kiley and any further papers necessary to give us a marketable title to this property."

The next letter received by plaintiff from defendant is dated March 2, 1901, and states, in reply to his letter of even date:

"We will be ready to close title on the Wayne and Waldorf at the office of Chas. P. Norton, * * * Buffalo, 12 m. Thursday March 7th. Kindly have * * * papers necessary for giving us correct title."

The plaintiff was asked whether when he received letters subsequent to February 11th he knew that title had passed to John B. Kiley, and responded that he knew it had passed, or was about to pass, as that was part of the arrangement; that he had never met Mr. Kiley, but his name had been given him by Mr. Sweeney, the secretary, or Mr. Sammis, the general counsel, of the Shareholders' Realty Company, as the party from whom the defendant would receive title; that the agreement was to convey to Mr. Kiley, and not a direct conveyance from the Shareholders' Company; that he wrote to Mr. Kiley on the subject, but never obtained a written contract from him, and Mr. Sammis said he refused to sign an executory contract, and would only execute a deed when the money was ready; that Mr. Sammis told him Mr. Kiley was the personal friend of Mr. Sweeney, who was going back and forth to Rochester arranging this thing; that the arrangement for the purchase of the apartment houses was oral, and, though there was an executory contract drawn, it was not executed, nor any writing given, till the property was transferred; that he told defendant's president at the time that the original arrangement for a transfer directly from the Shareholders' Company could not be carried into effect, as Mr. Sammis stated that there was some claim to the amount of eight or nine thousand dollars which must be gotten rid of to enable the company to give a good title, and hence the defendant company must take through a third person—some conduit—and be relieved of any possible litigation with outside parties; that defendant's president said this would be satisfactory, and the property as appraised was valuable and worth over $69,000, and he did not care how they got title; that the defendant company prepared an executory agreement, which it requested him to submit to Mr. Kiley, and he told the company that he was not personally acquainted with Mr. Kiley, who was a lawyer in Rochester, and a friend of Mr. Sweeney's, who was conducting the negotiations; that thereafter he informed the company that Mr. Kiley would not sign an agreement, but would sign a deed.

On behalf of the defendant, Mr. Kiley testified that he had no acquaintance with plaintiff, and had his conversations regarding the sale to defendant with Mr. Sweeney, and two or three days before the execution of the deed to defendant saw Mr. Cobe, the president, in Buffalo. "Mr. Cobe asked me if my name was Kiley. I told him it was. * * * That he represented the company [defendant] that Mr. Sweeney had informed me was to purchase this property, and that they had a lawyer * * * in Buffalo who would attend to the transfer for them, and asked me to accompany him to that office in Buffalo, which I did. * * * This lawyer * * * requested me to take a check in payment, * * * which I refused to do. * * * Then Mr. Cobe had a check cashed downstairs in the bank, and gave me the currency for the property, and I turned over the deed to him." Mr. Kiley testified that he originally bought the property acting for Mr. Sweeney, for whose brother he had been attorney; that Mr. Sweeney told him the Shareholders' Company had two pieces of property at Buffalo

"that they were going to sell, and that he thought he could get the job of attending to it for me," and he received orders from Mr. Sweeney after that in regard to the property; that Mr. Sweeney brought the money, and told him to purchase the property, which he did, for $52,000; that he thought the man for whom he held title was Mr. Miller, whom he never saw, and whom he understood was a creditor of the Shareholders' Company; that upon selling the property to defendant he turned over the money to Mr. Sweeney; that he had advertised the property as directed by Mr. Sweeney, and forwarded many replies to him. In addition we have the testimony of Mr. Cobe, who said he remembered signing the letter of January 9th, and that the plaintiff said he thought he could get the property for $69,000, as he had a good deal of influence with Mr. Sweeney and Mr. Barker, but never told him he was authorized to purchase for $61,000; that thereafter he sent his cousin to Buffalo to appraise the property. The defendant's secretary testified that the plaintiff told him he had been unable to get a written contract with the Shareholders' Company, and the property would have to be transferred to other parties, as there were liens to be taken care of; thereafter plaintiff wanted to fix a date for closing title, and he asked him several times about the contract, and he never produced such contract, and never authorized plaintiff to obtain a contract with Mr. Kiley.

The appellant urges that the judgment entered on the verdict in plaintiff's favor for the amount sought should be reversed for the reasons, among others, that the plaintiff was not the procuring cause of the purchase of the property by the defendant, and that much of the testimony introduced over defendant's objection and exception and relied upon to sustain the verdict was in variance with the express terms of the contract, which provided for a sale of the Shareholders' Company to the defendant, and not a sale by Mr. Kiley. This was not, in my opinion, a material change or variation in the original contract, it being unimportant whether the defendant obtained title to the property by a direct deed from the Shareholders' Company as the result of the plaintiff's efforts, or by his efforts obtained title through a conduit to whom it was desired by the Shareholders' Company to first transfer the premises for particular reasons. The real question presented upon this appeal is whether the evidence sustains the finding that the plaintiff was the procuring cause of the sale to the defendant, and we have, therefore, at some length reviewed the record. Although we have little testimony introduced by plaintiff as to the interviews he had and the negotiations which he conducted with the Shareholders' Company and its officers, and through the latter with Mr. Kiley, the plaintiff's statement that he had such interviews at the time in question is uncontradicted, as is his testimony that the letters and papers in evidence related to this transaction, and followed in the regular course of business. The letters contain ample evidence that the plaintiff was in active charge of the negotiations, and that the defendant was fully apprised of the manner in which the sale was to be consummated, namely, through Mr. Kiley, an at-

torney, and friend of Mr. Sweeney, the secretary of the Sharehold-ers' Company. This conclusion, moreover, is fortified by the tes-timony in defendant's behalf, Mr. Kiley frankly stating that Mr. Sweeney supplied the money and gave him the work as a favor, and the object was to satisfy the claim of a creditor. And Mr. Kiley had no hesitation, upon being introduced to defendant's president, in immediately proceeding with the transfer of the property. Further-more, the testimony of defendant's president and secretary is cor-roborative of the plaintiff's version. I think, therefore, that the finding of the jury is supported by the evidence.

The appellant's further points that there was error in the admis-sion of evidence and in the charge, and that the plaintiff misrep-resented to the defendant the price at which the property could be obtained, I have examined, but do not think they constitute ground for reversal.

I think, therefore, that the judgment and order appealed from should be affirmed, with costs.